**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated: October 25 2019**

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 19-32356 |
| | ) | |
| Unique Tool & Manufacturing Co., Inc., | ) | Chapter 11 |
| | ) | |
| Debtor and Debtor-in-Possession. | ) | |
| | ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF DECISION AND ORDER REGARDING MOTIONS TO DISMISS

The case is before the court for decision after an evidentiary hearing on motions to dismiss filed by Chemical Bank, now a division of TCF National Bank sbmt Chemical Bank ("Chemical") [Doc. # 68], and Waterford Bank, N.A. ("Waterford") [Doc. # 70], Debtor's objections to the motions [Doc. ## 118 and 117, respectively], as well as the responses of the Committee of Unsecured Creditors to the motions [Doc. ## 121 and 122, respectively].

Debtor voluntarily commenced this Chapter 11 case on July 26, 2019. The motions were filed on August 28, 2019. The court conducted an evidentiary hearing commencing on September 25, 2019, and concluding on September 30, 2019, with closing arguments. Movants brought their motions seeking dismissal "for cause" under 11 U.S.C. § 1112(b)(4)(A) ("substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation"); (B) ("gross mismanagement of the estate"); and (E) ("failure to comply with an order of the court"), as well as

alleged bad faith commencement of the case. At the hearing the parties agreed to develop one record on both motions, as well as on Waterford's separate motion to dismiss related case Althaus Family Investors Ltd., Chapter 11 Case No. 19-32357 in this court.

## FACTUAL BACKGROUND

Debtor Unique Tool & Manufacturing, Inc. ("Unique" or "Debtor") is an Ohio entity founded in 1963 by Harold Althaus. [Movants Ex. 5, p.2]. It is a family business currently owned and managed by Harold's sons Daniel, David and Douglas, [*Id.*], as it was when Chemical Bank's predecessor, Bank of Holland, and Waterford entered into lending relationships with the company. Unique operates as a custom metal stamper supplying parts to the electrical, appliance, refrigeration, automotive, satellite, and communications industries from a modern, leased 118,000 square foot facility located in Temperance, Michigan and which is owned by Ohio limited liability company and related debtor entity Althaus Family Investors Ltd. ("AFI") [*Id.*]. Unique's operations involve, and it owns, a substantial amount of machinery and equipment, some of it large and heavy and not readily moveable.

One of Unique's primary customers is Tecumseh Products, Inc. ("Tecumseh"). In reliance on Tecumseh's announced intention to source significant additional business to Unique, Unique and AFI invested heavily in 2013 on a business expansion to acquire the equipment and the additional real property and construct the building space necessary to supply Tecumseh Products. The secured loans at issue now financed that expansion. While Tecumseh Products remains an important customer of Unique, by 2016 "it was not the same business partner as it had been in earlier years." [Movants Ex. 5, p. 4]. Unique never received all the new business from Tecumseh, in which it invested approximately $4 million borrowed from Waterford and Chemical's predecessor. Among other things, Tecumseh's own financial stability wavered, its ownership and personnel changed, and production solely sourced to Unique was transferred to Brazil without consultation with or warning to Unique. [*Id.*]. Unique (and AFI) has still not recovered from that business shock. It was left with too much debt, too much space and equipment, not enough business and cash flow problems, all issues that unsurprisingly have impacted its borrowing relationships with its lenders. Suffice to say that Unique, AFI, Waterford and Chemical all worked more or less together over time to overcome them. But systemic financial management insufficiencies the smaller business could withstand became more acute in the pinch, breeding many of the conflicts on full display at the hearing.

Waterford refinanced existing debt and extended Unique a line of credit in March 2013 pursuant to a "term" note in the original principal amount of $1.6 million secured by all of Debtor's personal property. [Movants Ex. 4]. No dispute has been raised that Waterford's security interest is perfected and the first and best lien on all Unique's personal property, with the exception of certain equipment acquired with a Small Business Administration loan from Chemical's predecessor. Under the Waterford term loan documents, Unique was entitled to draw on a line of credit based on an advance rate formula of 80% of eligible receivables and 50% of inventory capped at $1.5 million. Accounts receivable older than 90 days from invoice date are ineligible under the loan agreement. The borrowing process was implemented through monthly borrowing base certificates submitted to Waterford and certified by an officer of Unique, generally Doug Althaus.

Over the years, the loan maturity on the Waterford term loan was extended by agreement of the parties 17 times, the most recent and final extension maturing on June 30, 2019. The maximum extension of credit under the note increased and decreased over that time, as did the interest rate, but the loan covenants generally remained the same. Unique consistently maintained timely monthly payments due on the term note as extended on various occasions through the final maturity date, and was not in payment default through commencement of the Chapter 11 case.

But Unique was in extended default of various non-monetary terms and covenants of the loan and out-of-formula on the line of credit. Calling shenanigans on Unique in connection with its receivables accounting and borrowing base certificates, Waterford commissioned a field examination report by a company called Lender Solutions, Inc. in June 2016. [Movants Ex. 5]. The examiners noted that they "received very good cooperation from the staff and owners of Unique during this review." [*Id.*, p.2]. The report confirmed the concerns of both Waterford and Chemical that "during 2015, Unique had been crediting and rebilling invoices and in 2016 had been prebilling sales by an average of 30 days." [*Id.*]. It also acknowledged the substantial out of formula status of various borrowing certificates and the lack of appropriate accounting and financial reporting capabilities and systems for a company its size. Its "Overall Conclusions" noted that Unique had many strengths, including that "[a]ll Bank term debt loan payments, inclusive of a real estate mortgage, have been paid timely and are in good standing," the company's excellent reputation in the stamping industry, and the excellent condition of the plant and equipment. [*Id.* at numbered p. 18]. The report also noted that Unique had a number of weaknesses,

3

including a substantial collateral shortfall, the prebilling of sales and rebilling of invoices, and that "Tecumseh Products has not lived up to its P.O. commitments." The report also made a list of recommendations to address these weaknesses, many of which did not come to pass. The court construes ongoing cash flow issues, rather than obstinate management resistance, as the main impediment to addressing all of Lender Solutions, Inc.'s identified weaknesses and recommendations.

Waterford delivered written notices of default to Unique in August 2017, and again on April 25, 2019. [Movants Ex. 9]. Waterford thus communicated to Unique starting in 2017, that it wanted out of the relationship and prodded Unique to repay it and move on to another lender. [*Id.*, p. 4/4]. Waterford declined to extend the term loan an 18th time past the June 30, 2019, maturity date and instead filed suit in the Monroe County, Michigan Circuit Court, on July 3, 2019, seeking foreclosure of its security interests, collection of the debt and appointment of a receiver. A hearing in the state court on appointment of a receiver was scheduled for July 26, 2019. The hearing was stayed upon filing of the Unique and AFI Chapter 11 cases hours before it was set to commence.

While Unique actively explored alternative conventional lending arrangements with other entities, including Huntington Bank and Mercantile Bank of Michigan, it was unable to successfully refinance the Waterford term loan. Unique was working right up to the commencement of this Chapter 11 case to secure a loan commitment from Mercantile Bank to take out Waterford. But Debtor's ability to secure a commitment from Mercantile Bank was stymied at least in part because Unique did not have 2017 and 2018 income tax returns or final 2018 financial statements and 2019 proformas. By then ubiquitous cash flow problems prevented Unique from paying its accountant, who thus would not complete the necessary financial work, a problem that persists post-petition.

As of the commencement of this Chapter 11 case, Unique owed Waterford approximately $1.8 million in principal and interest on the term loan.

Waterford also extended loans to AFI.

In March 2013, Waterford loaned AFI $1.3 million to refinance mortgage debt encumbering its real property pursuant to a term note. The AFI term note is secured by a first mortgage on the real property at which Debtor operates and was also guaranteed by Unique and the Althaus brothers. Starting in 2017, the maturity date of that note was extended a number of times, most recently by an Eighth Amended and Restated Term Note dated April 15, 2019, in the principal amount of $1,047,485.00.

4

That note matured according to its terms on June 30, 2019, [AFIM Ex. 1], with approximately $1,041,378 plus interest due at that time.

In November 2013, Waterford loaned AFI $2,932,937.00 to buy more real property and to construct a building addition thereon. [AFIM Ex. 3]. Chemical also has a participation interest in this loan. As of June 30, 2019, the principal amount of approximately $2,558,477 plus interest was due on the construction note, which matured according to its terms post-petition on September 30, 2019. The AFI construction note is secured by the second mortgage on the real property where Debtor operates and was also guaranteed by Unique and the Althaus brothers. There are cross-default provisions connecting all of the loans.

As of the commencement of this case, AFI owed Waterford approximately $3.6 million in principal and interest on the term and construction loans.

At the commencement of this case, Unique and AFI together owed Waterford approximately $5.4 million in principal and interest on the three loans.

A predecessor of Chemical loaned Unique the principal sum of $2,386,500.00 pursuant to a United States Small Business Administration note dated November 22, 2013, and as its terms were later modified by the parties. [Movants' Ex. 17, Ex. 2]. Waterford also has a participation interest in this loan. The purpose of the loan was to acquire specific equipment for the Tecumseh expansion. By its terms, the loan matures in December 2020. [Movants' Ex. 17, Ex. 2 p.18/86; Ex 6, p. 62/86]. The Althaus brothers and AFI unconditionally guaranteed the indebtedness. Chemical is the current holder of the note. There does not presently appear to be any dispute that Chemical has a properly perfected first lien in the specific equipment financed, as well as a second lien, behind Waterford, in all other personal property of Unique.

By May of 2018, there were acknowledged non-monetary defaults in the Chemical loan, resulting in the parties' execution of a Forbearance Agreement dated May 22, 2018. [Movants' Ex. 17, Ex.6]. As of May 4, 2018, the original indebtedness under the SBA note had been reduced to a principal balance of $1,198,223.65. [Movants Ex. 17, Ex. 6, p. 64/86]. One of the provisions of the Forbearance Agreement specified that "[u]ntil the Indebtedness has been fully repaid or until otherwise agreed, continue to enlist the services of a financial consultant satisfactory to the Bank, for the purpose of assisting with financial reporting and seeking refinancing of the Indebtedness." [*Id.*, p. 68/86]. With the

consent of Chemical, an auction of some of its equipment collateral occurred in 2018, with the proceeds paid over to it. A particular point of contention is the sale of one piece of equipment called a grinder that Unique pulled from the auction sale because a reserve price had not been met. Unique later sold the grinder in May 2019 at a private sale to a buyer in Mexico. Rather than paying the approximately $18,000 proceeds over to Chemical on account of its lien, the proceeds were deposited into Unique's bank account at Waterford and used for operations.

Unique also made the monthly payments on the Chemical SBA loan as agreed. Between the monthly payments and the auction proceeds, as of the commencement of this case Unique had paid the balance on the Chemical SBA loan down to a principal amount of approximately $492,299.

Unique leases the real property at which it conducts its business from AFI. Starting in 2018, Unique subleased part of the AFI mortgaged premises and some equipment (specifically a 1,400 ton capacity press and related equipment) to an Ohio company called Toledo Tool & Die, Inc. ("Toledo Tool"). [*See* AFIM Ex. 6]. Toledo Tool wears several hats in this proceeding. With Waterford's consent, Unique subleases to Toledo Tool part of the AFI premises. With Chemical's consent, [Movants Ex. 17, Ex. 6, p. 63-64/86], Unique also leases to Toledo Tool at those premises certain equipment (1,400 ton press and related equipment) on which Chemical has the first and best lien. But Toledo Tool has been a customer of Unique and a competitor to Unique. It is also a customer of Waterford, although serviced by a different loan officer than Unique. A representative of Toledo Tool took it upon himself to call a Waterford Bank representative to inquire what was happening to the grinder being moved out of the building that Debtor sold without paying the proceeds over to Chemical. Then leading up to the commencement of this Chapter 11 case, Toledo Tool made an offer to Unique and AFI to buy their assets for $6 million, with $5.5 million of that to be paid to the banks and the balance to be held back to fund in part 4 years of consulting services by the Althaus brothers, an offer Waterford calls a "good faith offer" but also one which would not appear to be enough to pay off the banks in full, a real estate tax deficiency of $65,000, or any unsecured creditors. [Debtor Ex. C]. The preliminary offer letter contemplated that Unique would work with the banks to "take a haircut." [*Id*.].

The monthly sublease rent of $19,367 Toledo Tool owes to Unique is assigned and paid directly to Waterford. The monthly equipment lease rent of $16,000 Toledo Tool owes to Unique is assigned and paid directly to Chemical. Those payments have continued post-petition, with Waterford electing to

6

apply the real estate lease payments to the Unique term loan obligations. According to Doug Althaus' testimony, however, while current in the base rent payments assigned and paid directly to Waterford and Chemical, Toledo Tool is behind on its share of CAM charges to Unique since June 2019. As a result, Debtor is shouldering the post-petition burden for all of the utilities at the property, not just those for its own operations. While AFI acknowledges that it owes delinquent county real estate taxes on the property of approximately $65,000, neither Unique nor AFI have been paying over to the county any amounts previously paid by Toledo Tool to Unique on account of a pro rata share of those taxes.

Another point of contention between Debtor and the banks are separate lending relationships Unique established to finance operations in 2019, one with an entity called Grand Mill Funding and another with an entity called National Funding.

At this point nobody seems clear on the nature of Unique's borrowing from Grand Mill. Doug Althaus testified that in January 2019 Grand Mill bought "purchase orders" from Unique, advancing funds so that it could complete customer orders evidenced by those purchase orders. The loan documents are not part of the court record. Ostensibly a secured lending relationship, Grand Mill might not have properly or timely filed UCC financing statements with which to perfect claimed blanket security interests in Unique's assets. The level of borrowing from Grand Mill is variously thought to range from $175,000 to $183,000.

The borrowings from National Funding apparently date to April 2019, which was the same time period Waterford delivered a written notice of default to Unique demanding again that it be refinanced out of the relationship. The documents regarding the National Funding loans, thought to be two loans for $72,000 each, are not in evidence.

Absent consent of Waterford and Chemical, the Grand Mill Funding and National Funding loans violate Unique's loan agreements with them. There is no basis to find that Unique obtained Chemical's consent for these loans or that Doug Althaus discussed them with the Chemical Bank loan officer. As to Waterford, Debtor argues that consent can be inferred because the loan proceeds all went through its Waterford operating bank account and were used to fund company operations. Additionally, Doug Althaus was discussing with the Waterford loan officer factoring receivables through another entity in that time frame. The court disagrees that Waterford either expressly or impliedly consented to Unique's alternative lending relationships with Grand Mill Funding and National Funding.

Debtor's Chapter 11 bankruptcy petition was then filed on July 26, 2019, the same day upon which Waterford's motion to appoint a receiver was scheduled to be heard in the Monroe County Circuit Court.

## LAW AND ANALYSIS

Chemical and Waterford seek dismissal for cause under 11 U.S.C. § 1112(b).

Section 1112(b) provides in pertinent part:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, *for cause* unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1) (emphasis added). Section 1112(b)(4) provides a non-exhaustive list of examples of "cause" for dismissal of a Chapter 11 case, all of which are actions (or inaction) that impair the proper purpose and conduct of a Chapter 11 proceeding. Those relied upon by Movants are (A) "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;" (B) "gross mismanagement of the estate;" and (E) "failure to comply with an order of the court." 11 U.S.C. § 1112(b)(4)(A), (B) and ( E). Both banks also assert that Debtor commenced this case in bad faith as cause for dismissal. "Bad faith" as cause for dismissal under § 1112(b) is rooted in case law from the Sixth Circuit Court of Appeals, which has "consistently held that a debtor's Chapter 11 petition may be dismissed if it was filed in bad faith." *Trident Assocs. Ltd. P'ship v. Metropolitan Life Ins. Co. (In re Trident Assocs. Ltd. P'ship )*, 52 F.3d 127, 130 (6th Cir. 1995).

A determination of cause for dismissal under § 1112(b) requires "a 'case-specific' factual inquiry which 'focuses on the circumstances of each debtor.'" *In re Creekside Senior Apartments., L.P.*, 489 B.R. 51, 60 (B.A.P. 6th Cir. 2013) (quoting *United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 371–72 (5th Cir.1987)). The party seeking dismissal carries the burden of proving that cause exists by a preponderance of the evidence. *Id.*

### I. Bad Faith

"A debtor's bad faith at any stage of a Chapter 11 case – 'commencement, during its prosecution, or at confirmation' – is cause for dismissal under § 1112(b)." *In re Four Wells Ltd.,* No. 15-8020, 2016

WL 1445393, *11, 2016 Bankr. LEXIS 1673, *31 (B.A.P. 6th Cir. April 12, 2016) (quoting *In re Alder* 329 B.R. 406, 410 (Bankr. S.D.N.Y. 2005)). In this case, Waterford and Chemical argue that Debtor acted in bad faith in filing its Chapter 11 petition in the first instance. The court disagrees.

A determination as to whether a debtor has acted in bad faith is a "'fact-specific and flexible determination' that must be made on a case-by-case basis by looking to a totality of the circumstances." *In re Lee*, 467 B.R. 906, 917 (B.A.P. 6th Cir. 2012) (quoting *Alt v. United States (In re Alt)*, 305 F.3d 413, 419 (6th Cir. 2002)). While there is no single test for determining good faith, the Sixth Circuit has set forth eight factors, none of which are dispositive, that may be probative in evaluating an organizational debtor's good faith:

(1) the debtor has one asset;

(2) the pre-petition conduct of the debtor has been improper;

(3) there are only a few unsecured creditors;

(4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;

(5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford;

(6) the filing of the petition effectively allows the debtor to evade court orders;

(7) the debtor has no ongoing business or employees; and

(8) the lack of possibility of reorganization.

*Trident Assocs. Ltd. P'ship,* 52 F.3d at 131 (quoting *Laguna Assocs. Ltd. P'ship v. Aetna Casualty & Surety Co. (In re Laguna Assocs. Ltd. P'ship)*, 30 F.3d 734, 738 6th Cir. 1994)).

These factors are not exhaustive and "cannot simply be mechanically tallied." *In re Four Wells Ltd.*, 2016 WL 1445393 at *14. Rather, the court "must look at the factors together and determine whether the petitioner sought to achieve objectives outside the legitimate scope of the bankruptcy laws when filing for protection under Chapter 11." *Id.* (citations omitted); *see Crown Village, LLC v. Arl, LLC (In re Crown Village Farm, LLC)*, 415 B.R. 86, 92 (Bankr. D. Del. 2009) ("Once these pieces of factual information are ascertained, courts must next apply them when considering: '(1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving the going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to

obtain a tactical litigation advantage.'"; citations omitted); *In re Webb MTN, LLC*, No. 3:07-CV-437. 2008 U.S. Dist. LEXIS 10030, 2008 WL 361402 at *3 (E.D. Tenn. Feb. 8, 2008) (despite the presence of a majority of the *Trident* factors, Chapter 11 case not filed in bad faith).

The first *Trident* factor is whether debtor has only one asset. This factor "has been characterized as 'new debtor syndrome' and includes single-asset debtors created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors." *MRL Residential Leasing, Inc. v. Investaid Corp. (In re MRL Residential Leasing, Inc.)*, 121 F.3d 709 (Table), 1997 WL 453163, *4, 1997 U.S. App. LEXIS 21525, *12 (6th Cir. Aug. 8, 1997). This case is not a single asset real estate case. At filing Debtor had employees, significant personal property, customers that buy its products and an ongoing business operation. The court finds that this factor and the seventh factor (whether debtor has an ongoing business or employees) do not weigh in favor of dismissal in this case.

Movants rely most heavily on the second *Trident* factor, arguing that improper pre-petition conduct of Unique with respect to the lenders, their rights, and collateral provide ample evidence of the bad faith commencement of this case.

Movants first point to Debtor's longstanding out of formula status on the Waterford line of credit. But that status is hardly new or news to the lenders, having been raised more than three years ago and the subject of the Lender Solutions, Inc. audit and comprehensive report dating to June 28, 2016. That report reflects cooperative management with inadequate accounting and financial reporting capabilities and practices, the fixes to which the court believes were stymied by ongoing cash flow issues. But that is largely the entity the banks agreed to support and finance in a business expansion, in 2013, that was ultimately unsuccessful, for reasons that appear to be other than Unique's performance and actions. The court finds that the age and duration of these loan agreement breaches are such that they are not indicative of pre-petition misconduct entitled to any weight at all in deciding whether this case was filed three years later in bad faith.

More problematic, however, are the more recent actions of Debtor cited by Movants that not only breached their loan agreements but imperiled their collateral positions. They are the sale of the grinder without paying the proceeds over to Chemical Bank and the lending relationships with Grand Mill Funding and National Funding that may or may not be secured or properly perfected if they are. The precise nature of those loan arrangements remains to be determined. And as the court has decided above,

10

there was no actual or implied consent on Movants' part to authorize these actions.

On the other hand, the court notes that the proceeds in all instances were used to operate the business, including continuing to make timely monthly payments to the banks, and thus to prevent erosion of Movants' collateral values in other respects. The proceeds were not diverted to other, or separate, or hidden bank accounts or entities. The grinder proceeds of approximately $18,000 cannot fairly be characterized as de minimis but compared to the much more substantial paydown of the Chemical loan that occurred due to the cooperative equipment auction, and for which the proceeds were paid over to Chemical, the court does not find intentional misconduct on the Debtor's part. There is no evidence that the grinder was pulled out of and withheld from the larger auction sale for the purpose of diverting Chemical's collateral proceeds.

Debtor made material mistakes pre-petition that should not have been made, in both respects, but the court finds that they are not of a type that should reflexively disqualify it from seeking relief under Chapter 11 of the Bankruptcy Code or that have the effect of promoting ongoing abuse of the Bankruptcy Code and process once here. This factor weighs in favor of dismissal because the court does not want to encourage such pre-petition conduct, but it also does not weigh as heavily and is not as egregious as Movants argue it is. Debtor used the funds it secured from its factoring activities and sale of the grinder to run the business and continue making monthly payments to the banks. *Cf. Trident Assocs. Ltd. P'ship,* 52 F.3d at 128-29 (single asset real estate debtor with no employees and no ongoing business created on the eve of foreclosure through restructuring designed to protect owners).

The third *Trident* factor is whether Debtor has only a few unsecured creditors. Debtor has scheduled 97 non-priority unsecured creditors and there is an unsecured creditors' committee that has been formed. This factor decidedly does not weigh in favor of dismissal in this case, which the unsecured creditors' committee also opposed at the hearing after hearing the evidence.

The fourth *Trident* factor of whether Debtor's property has been posted for foreclosure and the Debtor has been unsuccessful in defending against that foreclosure also does not weigh in favor of dismissal on bad faith grounds. Waterford had just commenced a state court collection action seeking foreclosure of its collateral liens and appointment of a receiver. Movants make much of the fact that Debtor commenced this case on the same day a receivership hearing was scheduled to occur in state court. The court fails to see how that timing is indicative of bad faith in this case. That Debtor believes

11

that it can better maximize value and return to all creditors, not just the secured lenders, in a collective proceeding in this court without a receiver picked out by a secured lender, is a valid purpose for commencing a Chapter 11 case. This is not the more exacerbated and problematic timing where a debtor has bided its time until the last minute <u>after</u> state or other court process had already played itself out to or nearly to the end, which is what this factor is intended to address. Commencing this Chapter 11 case in order to preserve the going concern or maximize the value of the Debtor's estate (including the receivables) serves a valid bankruptcy purpose, *Crown Village, LLC*, 415 B.R. at 92, even though filed on the eve of a foreclosure sale, *In re Four Wells Ltd*, 2016 WL 1445393 at *14 (quoting 7 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 1112.07 (16th ed. 2016) and stating that "the bare fact that the debtor desires to obtain the benefits of the automatic stay cannot by itself support a finding of bad faith. [D]ebtor must intend to obtain the benefit . . . for an improper purpose. . . ."). The court finds that it was not unreasonable for Debtor to seek a different forum and different procedures to promote maximization of value of the company while still protecting the interests of all parties. As a result of the timing of the instant case filing, *Trident* factors (5) and (6) are not at all relevant in this case. Related factors (4) through (6) do not collectively weigh in favor of dismissal.

According to Movants with respect to the eighth *Trident* factor, there is no possibility of Debtor's reorganization. In the context of a determination as to whether Debtor filed its bankruptcy petition in bad faith, which is what Movants argue, the inquiry must be whether, *at the time of filing*, there was no *possibility* of reorganization. *In re Lady Bug Corporation,* 500 B.R. 556, 564 (Bankr. E.D. Tenn. 2013) (bankruptcy court's determination that the property debtor relied on to reorganize was not property of the estate and that debtor thus had nothing to reorganize did not make the case a bad faith filing where debtor had reason to believe otherwise *at filing*). The court cannot make such a finding in this case.

Debtor's cash flow and business operations were clearly struggling at filing. They have been for a long time. But there are substantial combined equipment and real estate values between the two debtors, with one "good faith" offer by a competitor having been made before the case was filed, that shows there were options for reorganization at the time of filing. Chemical, in particular, appears to be oversecured on the SBA loan and was at the time of filing. From that perspective it cannot be said that there was no prospect of reorganization of this Debtor at the time of filing that made the very commencement of this case an act of bad faith toward its creditors and toward the bankruptcy process. There were efforts with

12

other lenders to refinance Movants' secured debt ongoing up to the time of filing. And while the court is more sanguine than management that those efforts can be successful given the persistent financial reporting and control insufficiencies that Movants have pointed out, the court cannot find that this case was commenced with a lack of possibility of a plan of reorganization, which can include the sale of the business or assets, such that its filing was an act of bad faith with no valid bankruptcy purpose from the very start. The court finds that this factor does not weigh in favor of dismissal in this case.

Overall, in considering the totality of the circumstances at filing, and weighing the *Trident* factors with but one of them supporting dismissal present in this case, the court cannot find that Debtor filed this case to perpetuate pre-petition misdeeds and mistakes or without any valid purpose or prospect under Chapter 11 of the Bankruptcy Code to repay creditors, both secured and unsecured. Movants have not sustained their burden of proving that this case was filed in bad faith for a purpose outside the legitimate scope of the Bankruptcy Code as "cause" for dismissal under § 1112(b).

## II. 11 U.S.C. § 1112(b)(4)(A)

An enumerated cause for dismissal on which Movants rely is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). This is a two-fold inquiry. Because § 1112(b)(4)(A) is written in the conjunctive, both requirements must be shown. *In re Wahliei,* 417 B.R. 8, 11 (Bankr. N.D. Ohio 2009).

With respect to the first requirement, the focus is on whether post-petition the debtor has suffered or continues to experience a negative cash flow, or, alternatively, declining asset values. *Id.; Matter of Moultrie,* 586 B.R. 498, 502 (Bankr. N.D. Georgia 2018). "Negative cash flow means that the estate's current liabilities are increasing more rapidly than cash is available to pay as due." *Id. at f.n.5* (citing *Colliers on Bankruptcy,* ¶ 1112-29[i], 16th Ed.) An inability to pay ongoing expenses, combined with an absence of reliable income, can establish cause. The *Trident* factor of the lack of a possibility of reorganization, discussed above, focuses on the time of filing. In contrast, "cause" as enumerated under § 1112(b)(4)(A) focuses on post-petition events and the status of the bankruptcy estate as experiencing substantial or continuing loss. *In re Miller*, 496 B.R. 469, 479 (Bankr. E.D. Tenn. 2013); *In re Creech,* 538 B.R. 245, 248-49 (Bankr. E.D.N.C. 2015).

In asserting this factor, Movants did themselves no favor with the timing of their motions. They were filed on August 28, 2019, just over a month after the Unique and AFI Chapter 11 cases were

commenced. As required by statute, the hearings were commenced less than a month later. It is hard to establish "substantial or continuing loss to or diminution of the *estate*" (emphasis added) within that time frame. Cases involving this factor tend to have been pending for more than a month, indeed often for many months. Debtor's Chapter 11 operating report for the first month of the case through August 31, 2019, was filed on the eve of the hearing. [Doc. # 123]. Nevertheless, statutory and practical timing notwithstanding, the lenders' argument that Debtor has essentially been operating in a workout situation for years struck a chord in reviewing the hearing evidence. Operating reports and the financial disclosures accompanying them have been aptly described as the life-blood of the chapter 11 process. *In re Creech*, 538 B.R. at 252. For that reason, after the hearing, the court entered a supplemental order indicating to the parties that it intended to supplement the record with and consider Debtor's post-petition operating report for the second month of the case, though September 30, 2019. That report was timely filed on October 17, 2019. [Doc. # 160].

Debtor's Statement of Operations as of 8/31/19 [Doc. # 123, p. 3/69] shows a net loss for the first month of the case of $40,991. On the other hand, its Statement of Operations as of 9/30/19 [Doc. # 160, p. 29/49] shows net earnings for the month of September of $15,267, and year to date of $44,903.

Compared, the August and September reports do show that the overall quality, although not necessarily the quantity, of Debtor's trade receivables is deteriorating post-petition.

| Report | 0-30 | 31-60 | 61-90 | Over 90 | Total |
| --- | --- | --- | --- | --- | --- |
| 8/31/19 | $99,901 | $234,113 | $248,025 | $747,679 | $1,343,814 |
| 9/30/19 | $157,312 | $7,071 | $234,360 | $995,704 | $1,394,448 |

The 0-30 amount as of 9/30/19 is what Debtor was projecting as its September sales in cash collateral hearings, after it badly missed the mark in projected sales in the month of August immediately after the case filing. At least two customers--one tipped off by somebody likely without the Debtor's best interests in mind in advance of the Chapter 11 filing—pulled their dies early on with the permission of the court.

Most notably, one customer accounts for $1.205 million of the total listed trade receivables as of 9/30/19, including $92,692 of the $157,313 in 0-30 day receivables as of that date. At the hearing, Doug Althaus testified the Debtor has been cultivating this customer and doing test work on parts for months, but that a corner has been turned for the better in the relationship going forward, as also evidenced by the

14

September 2019 invoices. He also testified that the ongoing business enhances, and does not detract from, the likelihood of payment of those receivables. Thus, based on his testimony at the hearing, which the court credits, that customer will either start paying now or it won't at all. Those receivables are either real or they aren't. And Debtor's post-petition operations have either stabilized post-petition, as the September operating report tends to show, or not.

Beyond the receivables, however, the two balance sheets both show substantial value in machinery and equipment of $6.587 million before depreciation, and inventory values that are not materially changed. Those values have not been challenged.

Although it is a close call because of the deterioration of receivable quality from August to September, the court cannot find as of the hearing date and from the record as supplemented by the September operating report that the estate has overall been subjected to substantial or continuing loss or diminution. Operations otherwise appear to have stabilized during the second month of the case, and there is no evidence that equipment and inventory (and AFI real estate) values have not otherwise remained constant. There has not been a showing of substantial or continuing negative cash flow post-petition or an overall decline in asset value.

As to the second element of "cause" for dismissal under §1112(b)(4)(A), the court likewise does not find the absence of a reasonable likelihood of rehabilitation at this stage of the case. The inquiry is subtly different and arguably a more demanding standard than reorganization as discussed above under the Sixth Circuit's eight bad faith factors. As to this second prong of § 1112(b)(4)(A), the issue of rehabilitation "is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort," *In re Miller*, 496 B.R. at 479-480 (citations omitted), and can "reestablish his business on a firm, sound basis." *In re Creekside Sr. Apartments, L.P.*, 489 B.R. at 53. Whether Debtor has sufficient business prospects to justify keeping the business operating depends on the status of the customer described above. Debtor's business operations have undeniably arrived at a critical juncture in that regard. But based on the evidence at the hearing as supplemented, the court cannot find at this time that Debtor does not presently have reasonable business prospects going forward and thus cannot find an absence of a likelihood of rehabilitation of its business operations.

For the foregoing reasons, the court finds that Movants have not shown "cause" for dismissal of

15

this case at this time under § 1112(b)(4)(A).

### III. 11 U.S.C. § 1112(b)(4)(B)

"Gross mismanagement" of the estate constitutes statutory cause under § 1112(b)(4)(B). There is little guidance in the case law as to what might constitute "gross mismanagement" in a particular case. Under the statute, the alleged gross mismanagement must occur post-petition because the estate is a post-petition entity. *In re Sunnyland Farms, Inc.*, 517 B.R. 263, 267 (Bankr. D.N.M. 2014). Thus, the primary focus of Movants' witnesses on pre-petition conduct, such as the extended out of formula problems, the failure to hire a financial consultant acceptable to the lenders, the factoring, the sale of the grinder, and the inability to complete basic financial reporting tasks are not post-petition issues. The post-petition conduct Movants focus on as gross-mismanagement of the estate appears to be a lack of communication from and candor about Debtor's plans for reorganization, the status of post-petition insurance coverage, and the status of payment of real estate taxes on the premises leased from AFI.

Counsel emphasizes Debtor's filing of motions to liquidate equipment and appoint an auctioneer(s) without prior consultation and discussion as to how those actions fit its big picture effort to reorganize as evidence of lack of communication and good faith negotiation indicative of gross mismanagement—in their view, more of the same post-petition. In that regard, Chemical directs the court to *In re Johnson*, 546 B.R. 83 (Bankr. S.D. Ohio 2016), the insolvency saga of professional hockey player Jack Johnson that bears little resemblance to a long-time family tool and die operation in southeastern Michigan. Johnson filed a Chapter 11 case to address substantial debt, much of which had been incurred purportedly on his behalf by his parents. After a year in Chapter 11, Johnson filed a motion to voluntarily convert his case to Chapter 7. His motion to convert was strenuously contested by creditors that Johnson alleged had ripped him off. One of the grounds upon which creditors successfully objected to conversion was that Johnson had acted in bad faith before and during the Chapter 11 case such that it would be necessary to dismiss a Chapter 7 case, making conversion fruitless. One of the examples of Johnson's glaring fiduciary shortcomings addressed by the court in its eighty odd page opinion, among many during the year-long Chapter 11 proceedings, was his failure to negotiate with the objecting creditors in good faith over treatment of their claims under a plan.

This court could not agree more with the truism advanced by the *Johnson* court that "[t]he commencement of a Chapter 11 case should serve as an 'invitation to negotiation,'" *Id*. at 129 (citation

omitted). But the proceedings two months into this case do not convince the court that Debtor is either unwilling or unable to make good on its "invitation" in furtherance of its fiduciary duties. Counsel for the unsecured creditor's committee reports that Debtor has been forthcoming and cooperative in providing information thus far. That Debtor as debtor-in-possession did not immediately embrace its secured lenders in sharing plans after having been emphatically told that they were done with it for good this time (albeit not unreasonably so from the lenders' perspective) notwithstanding that monthly payments were current and then getting sued by one of them in state court with a request to appoint a receiver for the business, topped off with a motion to dismiss filed 30 days into this case is not shocking to the court; the circumstances all around did not lay a groundwork for candor, trust and meaningful negotiations right off the bat. That Waterford has at least one other customer heavily enmeshed in this case breeds an understandable reticence from the information sharing-standpoint. Like Michael Corleone in the Godfather, whose job was to keep his family business solvent and reinvent it, Unique needed a wartime consigliere and not Tom Hagen at the beginning of this case.

The court is thus unpersuaded that Debtor's lack of communication with Movants about treatment of their claims so far amounts to gross mismanagement or breach of its fiduciary duties to the estate as a whole under the circumstances. To continue with the theme of the court in *Johnson*, the court finds that the facts are not presently such that either the court or Movants have reason to doubt the sincerity of the invitation they received from Debtor when it filed this case. *See id.* at 172. That said, as the court at the hearing admonished all involved, this case's chances of success as a means to repay all creditors will likely only be enhanced if those avenues of communication and the groundwork for effective negotiation can be rebuilt, and fast. Even though the facts and denial of the conversion motion in *Johnson* tell this court little about what it should do today in this case, Judge Hoffman's words about where things go from here couldn't be more apt: "[T]he parties should undertake good-faith efforts to resolve their differences so that a consensual plan of reorganization for the Debtor may be confirmed. Failing that, what lies ahead does not look promising—for the Debtor a future clouded by uncertainty, for the Objecting Creditors further delay, and for all parties additional costly litigation." *Id.*

The court agrees with Movants that cancellation of necessary and appropriate insurance coverages would constitute immediate cause for dismissal or conversion, be it as gross mismanagement of the estate or as separate statutory cause specified under § § 1112(b)(4)(C). The record shows that

17

notice(s) of cancellation were issued pre-petition. [Debtor Ex. G, ex. A]. There is no evidence that cancellation occurred. The testimony shows that the required premium(s) was paid, albeit with somebody's credit card. Althaus testified that coverage is in place through January 2020. Lacking information as to how premiums have been paid in the past, *cf.* 11 U.S.C. § 364(a), the court does not find gross mismanagement of the estate.

The unpaid real estate tax issue, which the court understands extends to the summer taxes due September 14, 2019, is an AFI estate issue. *See* 11 U.S.C. § 1112(b)(4)(I).

The court disagrees that the identified circumstances either individually or cumulatively constitute gross mismanagement of this estate.

### IV. 11 U.S.C. § 1112(b)(4)(E)

Movants point to Debtor's noncompliance with non-financial terms of cash collateral orders as cause for dismissal on the basis of "failure to comply with an order of the court." 11 U.S.C. § 1112(b)(4)(E). This provision acknowledges that compliance with court orders is a fundamental obligation of any party and that the protections a debtor gains under the Bankruptcy Code "travel in tandem with many obligations that the debtor must meet." *In re Babayoff,* 445 B.R. 64, 80 (Bankr. E.D. N.Y. 2011). The failure to comply need not be willful, or the product of bad faith, or fraud. *Id.* That an obligation arises by agreement does not change the importance of the directive once it is included in a court order. The failure to comply with a single court order may be sufficient for cause. But the court also believes that not every Debtor failure to comply with a court order in a Chapter 11 case constitutes cause for dismissal under § 1112(b)(4)(E). This is not a "gotcha" provision. Rather "the circumstances of lack of compliance may be taken into account by the court in determining whether to dismiss of convert the case." *Colliers on Bankruptcy,* ¶ 1112.04[6][e], (16th Ed. 2017)

Prior to the filing of the Motions, the court entered two short term consensual interim cash collateral orders. After the filing of the Motions, the court entered a third short term consensual interim cash collateral order. In those orders, Debtor agreed to and the court signed off on terms requiring document production to Movants. [Doc. ## 24 (Addendum), 58 (Addendum), 102 (Addenda One and Two)]. Among the items required to be produced are 2017 and 2018 CPA Reviewed Financial Statements. There is no dispute of fact that they have not been produced. Candidly, the court is not sure why Debtor agreed to produce these documents, let alone by August 2 (which appears to be a typo) or

18

even "at the earliest possible time." The absence of these statements as well as completed tax returns is now understood by the court to be a long-standing problem, with its inability to pay accountants necessary to get the work done the impediment. Debtor did file an application to employ an accountant to undertake the necessary work for the estate, showing its efforts to comply with the cash collateral order production obligations. [Doc. ## 99, 100]. But that application had to be withdrawn due to the Debtor's pre-petition indebtedness to the firm. [Doc. ## 103, 111, 115, 125]. By the third order, this production requirement had actually been modified in recognition of Debtor's inability to employ its prior accountant. [Doc. # 102, Addendum Two].

Another production requirement was a $5,000 inventory audit to be conducted at Debtor's expense. By the third interim cash collateral order, this requirement had been modified to require a Lender Solutions inventory audit with which Debtor would cooperate. [*Id.*].

By the fourth cash collateral hearing, held nearly a month after the Motions were filed, there was no agreement as to continuing use of cash collateral. Disputes over document production became more pronounced. The court thus heard testimony and entered a further interim order without the consent of the lenders. [Doc. # 116]. As a result of that hearing, the court concluded that Althaus "and staff at his direction have complied and, to the extent they have not fully done so, endeavored to comply to the best of their ability under the circumstances." [Doc. # 116, p. 6/17]. There was no further document production requirement included in the court's fourth interim order. [*Id.*].

The court agrees with Movants that Debtor did not comply with all of its production obligations under the first three cash collateral orders. But it was simply not able to comply with some of them. Moreover, noncompliance did not frustrate either the purpose or process of this Chapter 11 case, because (1) the requirements not met bear minimal, if any, relationship to adequate protection of the secured creditors' interests in cash collateral going forward, which is the procedural context in which the directive arose; (2) Debtor has cooperated in producing information and documents without a court order to the unsecured creditors committee and apparently, the United States Trustee, c*f.* 11 U.S.C. § 1112(b)(4)(H)(failure timely to provide information requested by the United States Trustee is an enumerated cause for dismissal); and (3) as the court previously concluded, to the extent of noncompliance, Debtor complied to the best of its ability to do so at the time. As noncompliance did not impede the valid purpose or progress of this Chapter 11 case, which is the point of § 1112(b)(1), the

19

court finds that Movants have not established cause for dismissal under § 1112(b)(4)(E).

**THEREFORE**, for all of the foregoing reasons, good cause appearing,

**IT IS ORDERED** that the motions to dismiss filed by Chemical Bank, now a division of TCF National Bank sbmt Chemical Bank [Doc. # 68], and Waterford Bank, N.A. [Doc. # 70] are **DENIED,** without prejudice.

###